UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 12-21758-CIV-MORENO

WESTCHESTER FIRE INSURANCE CO.,

    Plaintiff,

vs.

MID-CONTINENT CASUALTY CO.,

    Defendant.
_____/

## COURT FINDINGS AND CONCLUSIONS

This is a suit by an excess insurance carrier against the primary insurer for common law bad faith and Florida statutory bad faith. Plaintiff Westchester Fire Insurance Company's two-count complaint alleges that Defendant Mid-Continent Casualty Company acted in bad faith in failing to settle the underlying action. After conducting a bench trial, the Court pursuant to Federal Rule of Civil Procedure 52 makes findings of fact and separate conclusions of law as set out in this order. The Court concludes that Westchester's evidence of Mid-Continent's bad faith to settle the underlying claim before trial is insufficient. However, the Court also finds that Westchester has proven by a preponderance of the evidence that Mid-Continent acted in bad faith in failing to notify Westchester of the settlement offer after the verdict. Therefore judgment in favor of Plaintiff Westchester Fire Insurance Company is entered in the amount of $390,173.

### I. FACTUAL BACKGROUND

On May 19, 2003, Jesus Pillado suffered multiple injuries while operating a concrete mixer truck manufactured and sold by Continental Manufacturing, Inc. According to Pillado, the

truck's air hopper assembly dropped on him when he attempted to lower it with a tire iron after the assembly had become wedged in the upright position. As a result of the accident, Pillado suffered several injuries including brain damage and fractured vertebrae. Pillado subsequently filed a products liability suit against Continental on January 12, 2006 in Miami-Dade County, Florida.

During this time, Continental had a primary insurance policy of $1 million issued by Defendant Mid-Continent. In addition, Continental possessed an umbrella insurance policy from Plaintiff Westchester with a $5 million limit. Westchester's umbrella policy stood in excess to Mid-Continent's primary policy, covering certain damages and occurrences.

In the ensuing litigation, Mid-Continent provided a defense for Continental through attorney Michael J. Paris. Prior to trial, Pillado, represented by attorney Scott Sandler, presented an economic loss exceeding $1 million. Furthermore, he intended to produce experts who would testify at trial that the accident resulted in several fractures, brain damage, permanent hearing loss, a urological impairment requiring a penile implant, and an exacerbation of his glaucoma causing a significant decrease in vision in his left eye.

In early January 2008, defense counsel Paris conducted a mock trial with two separate jury pools. The first pool of ten resulted in seven jurors finding for Continental while the remaining three found in favor of Pillado, awarding him $2 million to $4 million in damages. These three also assigned 0% to 10% of comparative fault to Pillado. In the second pool of seven, three jurors found in favor of Continental while the other four found for Pillado, awarding him $2.3 million to $3 million in damages. These four additionally assigned 10% to 25% of comparative fault to Pillado. Paris would later state that he "learned several things" from the mock trial that helped him to develop his trial strategy and strengthen his case. Ex. 26, at 22.

Following the mock trial, Mid-Continent's claims adjuster, Alycia Stevens, concluded that a jury would award Pillado $1.6 million to $2 million in damages if it found in his favor. Nevertheless, Stevens believed that Pillado was in fact 75% to 90% comparatively at fault based on a number of factors that she took into account. These factors included the lack of witnesses to the accident, the inability of an expert to recreate the accident, the presence of warnings on the truck, the lack of any defects in the truck, and the fact that Pillado attempted to lower the hopper in a manner that was not intended. Indeed, Stevens felt that a number of Pillado's alleged injuries, including the penile implant and aggravated glaucoma, were not even related to the accident. Consequently, she recommended a settlement range of $165,000 to $500,000. Thus, a week prior to mediation, Mid-Continent submitted a settlement offer of $100,000. Pillado at this time demanded $3.5 million to settle his claim.

On January 22, 2008, the parties held their first mediation. Though Mid-Continent increased its offer to $150,000 and later $200,000, the mediation resulted in an impasse as Pillado only lowered his position to $3.3 million. Stevens later testified that Mid-Continent was not prepared to offer a larger amount within its settlement range so as to avoid any impact on future settlement negotiations. In Mid-Continent's estimation, if it offered an amount at the high end of its range early on, Pillado would use that figure as a base amount in future negotiations, thereby increasing the final settlement figure. In light of the substantial gap between Pillado's demand and Mid-Continent's proposed range, Mid-Continent felt it would be futile to increase its offer.

On February 1, 2008, Westchester issued its first demand for Mid-Continent to settle the case, even offering to contribute an amount from its layer of coverage if Mid-Continent made a $1 million offer. Westchester followed this request with two successive demands on March 11,

2008 and May 13, 2008 for a settlement within Mid-Continent's policy limits. At this time, Pillado had further reduced his settlement demand to $2 million. Although Mid-Continent had now expended over $300,000 in litigation costs, the insurance company stood put at its $200,000 offer. While the parties scheduled a second mediation for May 21, 2008, the meeting was canceled at Continental's and Mid-Continent's request.

Mid-Continent thereafter began contemplating the purchase of Pillado's worker's compensation lien valued at approximately $500,000. The insurance company hoped that doing so would remove a potential stumbling block in future settlement negotiations by eliminating the uncertainty that Pillado would otherwise face in having to negotiate a satisfaction of the lien in addition to settling his claim. Moreover, Mid-Continent wished to remove $500,000 from Pillado's potential damages, either by preventing Pillado from boarding that amount or by requesting a set-off from the gross verdict. Despite legal uncertainty that it could actually accomplish this reduction in Pillado's total damages, Continental eventually purchased the lien for $55,000.

With the purchase of the lien, defense counsel Paris approached plaintiff's counsel Sandler for further negotiations in April 2009. Pillado however refused to alter his $2 million offer. Paris then advised Sandler that the case would not settle for any amount close to $1 million, including a figure in the high $900,000 range. Sandler indicated at this time that he was negotiating with Steven Marks, a renowned plaintiff's attorney in Miami-Dade County, to allow Marks to try the case. Relaying these discussions to Stevens in an April 16, 2009 letter, Paris acknowledged that Sandler might at the moment settle the claim for a lower figure than would be possible after Marks took the case. Though he had "absolutely no idea as to what Mr. Sandler's bottom line or range [was] in this particular case," Paris ventured to "speculate that [the] case

might settle within the range of $600,000 up to $750,000." Ex. 23, at 3. Nonetheless, Sandler had given Paris "no indication that [this] assumption [was] in fact his range." *Id.*

With Marks now aboard to try Pillado's case, Westchester made its fourth demand for Mid-Continent to settle on May 4, 2010. At the pre-trial hearing two days later, Marks asked Paris if he would be interested in a "high/low agreement." Though Paris requested specification of the terms of such an agreement, he never received a response from Marks. On June 9, 2010, Stevens prepared a final pre-trial summary in which she estimated a gross settlement range of $1,129,000 without factoring in any comparative fault. However, Stevens anticipated that the jury would find Pillado entirely at fault for the accident. Similarly, Paris stated in his pre-trial report:

> It is our belief that there is a 70% chance of a defense verdict in this matter and on the 3 times out of 10 that the plaintiff may obtain a verdict, we anticipate a substantial amount of comparative negligence will be assessed against the plaintiff.
> Considering plaintiff's counsels [sic] anticipated position of liability and damages, we believe the settlement range of this claim is $150,000–$350,000 (in light of the settlement of the worker's compensation lien), and, likewise with respect to the settlement of the worker's compensation lien, the net verdict exposure on this claim is in the range of zero–$650,000.

Ex. 26, at 24–25.

In light of these conclusions, the parties headed for trial in front of Judge Michael Genden. Mid-Continent now asserts that Pillado never offered to settle for Mid-Continent's $1 million policy limit prior to the start of trial. Nevertheless, Marks testified before this Court that he did in fact reach out to Paris in the days before trial to make Pillado's first $1 million settlement offer. Marks also insisted that he had indicated a willingness to further reduce the demand to $975,000 to allow Mid-Continent to save face.

Regardless, the parties did not settle at this time and trial began on June 14, 2010. Prior

to jury selection, Judge Genden issued his decision regarding the worker's compensation lien, announcing that he "would allow [Pillado] to 'board' the past medical expenses and past wage loss, but would set those amounts off post verdict [sic] by the value of the lien." Ex. 34, at 2. The following day, the parties concede that Marks made a $1 million settlement offer to which Mid-Continent did not respond. In fact, Mid-Continent never offered more than $150,000 throughout the trial. On the sixth day, a juror who had been excused before Continental's case in chief stated in an interview with defense counsel that she would have found in favor of Pillado. Nonetheless, no expert could recreate Pillado's accident and Pillado testified that he was partly at fault. Additionally, an alternate juror who sat throughout the entire case admitted upon excusal that he would have found Pillado 50% at fault. Westchester also claims that it issued four more demands for Mid-Continent to settle before the trial's completion.

At the conclusion of the trial on June 30, 2010, the jury returned a verdict in favor of Pillado with no comparative fault, awarding him $1,705,173. Paris however still believed that he could receive a $400,000 reduction in damages from a portion of the worker's compensation lien. In truth, Judge Genden indicated at a hearing on a motion in limine on June 17, 2010 that "he was not inclined to allow [Pillado] to obtain a double recovery" consistent with his earlier statement that he would set the amount off post-verdict. *Id.* Moreover, though Pillado claimed over $300,000 in costs, Paris felt that Judge Genden would not award him this amount pursuant to the Supreme Court's guidelines. Thus, with a $400,000 reduction from the lien and an award of less than $300,000 in costs, Mid-Continent expected a net award not to exceed $1.6 million.

On July 14, 2010, Marks contacted Paris to make a final settlement offer of $1.6 million. The following morning, Paris sent an email to Stevens informing her of the settlement offer. Significantly, Paris did not include a representative of Westchester on the email though he had

included Westchester on previous reports regarding the underlying action. Within six hours, Stevens replied that this was "no deal for [Mid-Continent]." Ex. 36. She likewise did not inform Westchester of this offer, later testifying that she "inadvertently" omitted Westchester from the email correspondence.

The court entered its final judgment against Continental on September 8, 2010 in the amount of $1,990,173. Judge Genden in the end chose not to permit a set-off for the worker's compensation lien and awarded Pillado $285,000 in costs assigned to Mid-Continent. With the deduction of Mid-Continent's $1 million policy limit and the accompanying $285,000 in costs, the judgment resulted in an excess exposure over the primary policy against Westchester in the amount of $705,173. Westchester subsequently brought this suit against Mid-Continent on May 9, 2012 alleging that Mid-Continent acted in bad faith by refusing to settle Pillado's claim. This Court conducted a two-day bench trial on the matter on May 21 and 22, 2013.

## II. LEGAL STANDARD

Under Florida law, an insurer has a duty when handling claims against its insured to "use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Macola v. Gov't Emps. Ins. Co.*, 953 So. 2d 451, 454–55 (Fla. 2006) (quoting *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)). The Supreme Court of Florida has further elaborated on this duty, noting that

> when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a

> settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Gutierrez*, 386 So. 2d at 785 (citations omitted).

Florida also recognizes a third-party right to maintain an action against the insurer under the common law to recover the amount of an excess judgment based on the insurer's breach of its good faith obligation. *Macola*, 953 So. 2d at 455. The essence of this type of action is "to remedy a situation in which an insured is exposed to an excess judgment because of the insurer's failure to properly or promptly defend the claim." *Cunningham v. Standard Gaur. Ins. Co.*, 630 So. 2d 179, 181 (Fla. 1994). It is therefore well-settled that "an excess insurer is entitled to maintain a common law bad faith action against a primary insurer." *Vigilant Ins. Co. v. Cont'l Cas. Co.*, 33 So. 3d 734, 737 (Fla. Dist. Ct. App. 2010).

"[T]he gravamen of what constitutes bad faith is whether under all the circumstances an insurer failed to settle a claim against an insured when it had a reasonable opportunity to do so." *Contreras v. U.S. Sec. Ins. Co.*, 927 So. 2d 16, 20 (Fla. Dist. Ct. App. 2006). "Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith." *Merrett v. Liberty Mut. Ins. Co.*, No. 3:10-cv-1195-J-12MCR, 2013 U.S. Dist. LEXIS 43868, at *7 (M.D. Fla. Mar. 27, 2013). Nevertheless, "[c]ourts also have clarified that bad faith is distinct from ordinary negligence in that '[t]he essence of an insurance bad faith claim is that the insurer acted in its own best interests, failed to properly and promptly defend the claim, and thereby exposed the insured to an excess judgment.'" *Id.* at *8 (quoting *Maldonado v. First Liberty Ins. Corp.*, 546 F. Supp. 2d 1347, 1353 (S.D. Fla. 2008)). Indeed, the law "clearly states that bad faith is more than mere negligence." *Losat v. Geico Cas. Co.*, No. 8:10-cv-1564-T-17TGW, 2011 U.S. Dist.

LEXIS 134104, at *26 (M.D. Fla. Nov. 21, 2011). Accordingly, "an insurer who is only negligent in its handling of an insured's claim, without more facts, does not rise to the bad faith standard and as a result cannot be held liable for an excess judgment." *Id.* "Thus, insurers have a positive duty to handle claims in a way that protects the interests of their insured, but they are not required to handle them perfectly, nor must they act without having had sufficient time to process and investigate a claim." *Novoa v. GEICO Indem. Co.*, No. 12-80223-CV-HURLEY/HOPKINS, 2013 U.S. Dist. LEXIS 6519, at *14 (S.D. Fla. Jan. 16, 2013).

In examining the totality of the circumstances to determine whether an insurer acted in bad faith, courts consider a number of factors that are pertinent to this case. First, "[b]ad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause." *Davidson v. Gov't Emps. Ins. Co.*, No. 8:09-cv-727-T-33MAP, 2010 U.S. Dist. LEXIS 113824, at *24 (M.D. Fla. Oct. 26, 2010) (quoting *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. Dist. Ct. App. 1991)). "Where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Id.* (quoting *Powell*, 584 So. 2d at 14). Indeed, "[t]he crux of a bad faith claim is the self-serving delay caused by the insurer's failure to adjust the claim in a timely manner, which exposes its insured to an excess judgment." *Noonan v. Vt. Mut. Ins. Co.*, 761 F. Supp. 2d 1330, 1336 (M.D. Fla. 2010). Second, "[a]ny question about the possible outcome of a settlement effort should be resolved in favor of the insured" as "the insurer has the burden to show not only that there was no realistic possibility of settlement within policy limits, but also that the insured was without the ability to contribute to whatever settlement figure that the parties could have reached." *Davidson*, 2010 U.S. Dist. LEXIS 113824, at *24 (quoting *Powell*, 584 So. 2d at 14). Third, the insurer has a duty to "advise the insured of settlement

opportunities and the probable outcome of a lawsuit and to warn him of the consequences of an excess judgment so that he might take whatever steps are available for his own protection." *Id.* (quoting *Powell*, 584 So. 2d at 14). Consequently, "[w]here the insured reasonably relies on the insurer to conduct settlement negotiations, and the insurer fails to disclose settlement overtures to the insured, the jury may find bad faith." *Id.* at *24–25 (quoting *Powell*, 584 So. 2d at 14–15). Finally, "[a]n insurance company's reliance on advice of counsel is a factor to be considered in bad faith cases." *Kearney v. Auto-Owners Ins. Co.*, No. 8:06-cv-595-T-24TGW, 2009 U.S. Dist. LEXIS 108918, at *13 (M.D. Fla. Nov. 5, 2009) (citing *Cotton States Mut. Ins. Co. v. Trevethan*, 390 So. 2d 724, 728 (Fla. Dist. Ct. App. 1980)).

### III. DISCUSSION

#### A. Findings of Fact

At the outset, the Court notes that the parties have stipulated to most of the factual record in this case. In truth, despite the parties' assertions to the contrary, the Court finds that Westchester and Mid-Continent have only presented one factual dispute that is material to the resolution of this case. Specifically, Westchester contends that Pillado in fact presented Mid-Continent with an offer to settle within Mid-Continent's $1 million policy limit prior to the start of the underlying trial. Though he could not recall a particular date, plaintiff's counsel Marks testified that he had spoken with defense counsel Paris about settling for $1 million at some point before the trial began on June 14, 2010. Indeed, Marks claimed that he had even offered to reduce the figure to $975,000 as an additional incentive to settle. Mid-Continent however denies that Paris had any such conversation with Marks and maintains that Pillado made his first and only attempt to settle for $1 million on the second day of trial.

Based on Marks's convincing testimony and the inability of Mid-Continent to sufficiently

explain this discrepancy, the Court concludes as a matter of fact that Pillado made an attempt to settle within Mid-Continent's $1 million policy limit at some point prior to June 14, 2010. The Court will therefore take this fact into account when making its ultimate determination in this matter.

### B. Conclusions of Law

#### 1. Mid-Continent's Pre-Verdict Conduct

Having reviewed the factual record and the testimony presented at trial, the Court concludes as a matter of law that Mid-Continent's pre-verdict conduct did not constitute bad faith. As an initial matter, the Court finds that the results of the mock trial neither support nor detract from a finding that Mid-Continent satisfied its duty of good faith. Though Westchester is correct in noting the substantial amount of mock jurors who found in favor of Pillado with little comparative fault, the Court cannot ignore the fact that a majority of jurors in total found in favor of Continental. A mock trial by its nature is a tool for attorneys to use in the preparation of their litigation strategies as Paris himself did, but it does not stand as a conclusive bellwether. Indeed, even if it were such an irrefutable indicator, the outcome of this mock trial bolstered Mid-Continent's position just as much as it supported Westchester's.

Using what information it could gather from the conflicting results of the mock trial, Mid-Continent proceeded to formulate its own evaluation of the case and develop a settlement range which it thought reasonable. While Westchester insists that Stevens had no basis for formulating her report based on the findings of the seven mock jurors who awarded damages to Pillado, Stevens in fact premised her calculations on a reasonable anticipation of comparative fault based on the facts of the case such as the presence of warnings on the truck and the absence of any defect in the hopper.

Mid-Continent likewise acted reasonably in relying on Paris's advice as defense counsel. As an accomplished trial attorney with decades of experience, Paris felt that the case was 70% defensible with a considerable amount of comparative liability likely in the instances where a jury would find in favor of Pillado. Additionally, Paris valued the highest possible verdict exposure at less than $1.2 million which, when paired with the possible reduction of the worker's compensation lien, fell to $650,000. *See* Ex. 26, at 24–25. Consequently, Paris recommended a settlement range of $150,000 to $350,000 to which Mid-Continent adhered. Though reliance on advice of counsel is only one factor for the Court to weigh, this consideration along with Mid-Continent's independent evaluation of the case lend support to a finding that Mid-Continent did not act in bad faith prior to the verdict.

The Court further concludes that Mid-Continent did not exhibit bad faith in its handling of Pillado's pre-verdict settlement offers as well as Westchester's settlement demands. As Mid-Continent explained at trial, it had no reason to increase its settlement offer at mediation when Pillado refused to lower his settlement demand below $3.3 million. With the substantial divide between the two parties' positions, such a move by Mid-Continent would have been fruitless and would only have served to harm its position in future settlement negotiations. In fact, Pillado's insistence on a demand of $2 million until shortly before trial never presented anything close to a viable opportunity to settle based on Mid-Continent's reasonable assessment of the case. Contrary to what Westchester may argue, liability in this case was not so clear, and a judgment in excess of the policy limits was not so likely, as to compel Mid-Continent to settle this case under such unfavorable circumstances. *See Davidson*, 2010 U.S. Dist. LEXIS 113824, at *24.

As for Paris's conversation with Sandler in April 2009, the Court does not find that this constituted a "window" for Mid-Continent to settle within its $1 million policy limit. While

Paris stated that he believed Sandler might accept an offer of $600,000 to $750,000, he admitted at the same time that he was merely speculating and had "absolutely no idea as to what Mr. Sandler's bottom line or range [was] in this particular case." Ex. 23, at 3. Similarly, the evidence does not support Westchester's contention that Marks's inquiry at the pre-trial hearing regarding the possibility of a "high/low agreement" constituted another neglected chance for a settlement. In response to Marks's query, Paris requested but never received specific details regarding the terms of such an agreement. Without further evidence of a particular offer made, the Court cannot deem this encounter to be a concrete settlement attempt either.

Nor do Pillado's two settlement offers within Mid-Continent's policy limits prior to and during trial alter the Court's decision. At the time that those offers were made, nothing had occurred that would have caused Mid-Continent to reconsider its reasonable evaluation of the case or its anticipation of a verdict in favor of Continental. While Marks may have offered an agreement for as low as $975,000 before trial, that figure was still over $100,000 more than the sum of the $350,000 high end of Paris's recommended settlement range plus the $500,000 of the worker's compensation lien should Judge Genden refuse to allow a reduction. *See* Ex. 26, at 24–25. In Paris's estimation at the onset of trial, Mid-Continent risked a maximum verdict exposure of $1,150,000 if no reduction were made for the worker's compensation lien. *See id.* Yet Paris only anticipated a 30% probability of this result with the far likelier outcome being a finding of no liability on the part of Continental. Furthermore, Paris had reason to believe based on Judge Genden's statements on the first day of trial that he would receive a set-off for the worker's compensation lien should the jury award damages to Pillado. *See* Ex. 34, at 2. As a result, Pillado's offers at that time did not present a reasonable opportunity to settle.

The Court additionally observes that Mid-Continent made a significant effort to facilitate

a settlement through the purchase of Pillado's worker's compensation lien. Absent this purchase, Pillado would have needed to have factored in the satisfaction of this lien when considering future settlement offers. Mid-Continent's decision to eliminate this consideration therefore assisted both Pillado by easing his decision making process regarding a settlement, as well as Westchester by increasing the potential for a settlement. Moreover, Mid-Continent intended the purchase as a means of reducing Pillado's damages should the jury render a verdict in his favor, a decision that could have moderated the net exposure for both Westchester and itself.

Thus as it approached a verdict, Mid-Continent did not fail to properly or promptly defend the claim against Continental. Though Mid-Continent knew that the addition of Marks, a skilled attorney with superb qualifications, would pose an additional impediment to successfully defending Continental, it did not act in bad faith in believing that this obstacle was surmountable based on the informed evaluations of the case that were available at the time. Indeed, Pillado himself testified at trial that he was partly at fault for the accident. Nor should Mid-Continent have necessarily abandoned the trial after the interview with the excused juror as Westchester contends. Given that the juror had not even heard Continental's case in chief at the time, Mid-Continent had no reason to consider her as a precursor of an adverse judgment. Armed therefore with a proficient attorney of its own in Paris, Mid-Continent proceeded through the litigation and trial with a reasonable anticipation that it would prevail. That it ultimately did not succeed in a case whose outcome was far from likely does not transform Mid-Continent's conduct into bad faith when viewed after the fact. Consequently, the Court finds as a matter of law that Mid-Continent did not act in bad faith in failing to settle prior to the verdict.

2. Mid-Continent's Post-Verdict Conduct

Turning to Mid-Continent's handling of the case following the jury verdict, the Court

concludes as a matter of law that Mid-Continent acted in bad faith in its treatment of Pillado's $1.6 million offer. At trial, Mid-Continent maintained that this offer was not reasonable from its perspective at the time due to its belief that it could request a set-off from the gross verdict for a large portion of Pillado's worker's compensation lien. In addition, it anticipated that Judge Genden would not award Pillado the full $300,000 in requested costs. As a result, Mid-Continent believed that the final net verdict would not exceed $1.6 million, rendering Pillado's post-verdict offer unreasonable. As this was a purely legal issue upon which Mid-Continent had to depend on defense counsel Paris for advice, the Court does not find that Mid-Continent's reliance in itself was bad faith. In truth, Mid-Continent had a rational basis for this belief in the trial statements from Judge Genden indicating as much, just as it had pre-verdict.

Nevertheless, the Court finds that Mid-Continent acted in bad faith in failing notify Westchester of the $1.6 million settlement offer. As noted, an insurer's duty of good faith includes advising the insured, or excess carrier in this case, of settlement opportunities. *Davidson*, 2010 U.S. Dist. LEXIS 113824, at *24. Thus where an insured "reasonably relies on the insurer to conduct settlement negotiations, and the insurer fails to disclose settlement overtures to the insured, the jury may find bad faith." *Id.* at *24–25 (quoting *Powell*, 584 So. 2d at 14–15). Mid-Continent at trial argued that its failure to include a representative of Westchester on the July 15, 2010 email between Paris and Stevens was the result of mere inadvertence. Though the Court acknowledges that mere negligence alone does not equal bad faith, *see Losat*, 2011 U.S. Dist. LEXIS 134104, at *26, the Court finds that this omission was more than mere negligence. Mid-Continent knew of its duty of good faith to Westchester as the primary insurer and was fully aware of Westchester's interest in settling the case, if only from the eight previous demands that Westchester had made calling for a settlement. Yet it only took six

hours for Mid-Continent to reply to Paris that this was "no deal for [it]." Ex. 36. The Court cannot ignore the fact that Mid-Continent made this decision in its own interest without any consultation with Westchester.

This conclusion is further bolstered by the certainty that existed of an excess judgment against Westchester. Even factoring in a $400,000 reduction of the original jury award for the worker's compensation lien, Mid-Continent knew that it was going to face a sizeable award of costs, even if short of the full $300,000 as Paris had hoped. Accordingly, it knew to expect an award exceeding $1.3 million that would leave Westchester with some level of excess exposure. In light of the guaranteed excess exposure whose extent was not and could not be predicted, the Court cannot excuse Mid-Continent's failure to confer with Westchester. Mid-Continent's hasty dismissal of the $1.6 million offer because it did not suit its best interests represents the essence of an insurance bad faith claim. *See Merrett*, 2013 U.S. Dist. LEXIS 43868, at *8. For this reason, the Court awards Westchester $390,173 as the difference between the final judgment of $1,990,173 and Pillado's $1.6 million settlement offer.

## IV. CONCLUSION

For the reasons stated, it is

**ADJUDGED** that Plaintiff Westchester Fire Insurance Company has proven by a preponderance of the evidence that Defendant Mid-Continent Casualty Company's handling of

the underlying case following the jury verdict constituted bad faith. The Court therefore enters judgment in favor of Plaintiff Westchester Fire Insurance Company in the amount of $390,173.

DONE AND ORDERED in Chambers at Miami, Florida, this 21st day of ~~May,~~ June, 2013.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:

Counsel of Record